**SEA HUNT, INC., Plaintiff,**

v.

**THE UNIDENTIFIED, SHIPWRECKED VESSEL OR VESSELS, their apparel, tackle, appurtenances, and cargo located within coordinates 38 degrees 01′36″ North Latitude, 75 degrees 14′33″ West Longitude; 37 degrees 57′21″ North Latitude, 75 degrees 13′00″ West Longitude; 38 degrees 01′36″ North Latitude, 75 degrees 13′14″ West Longitude; 37 degrees 57′33″ North Latitude, 75 degrees 17′44″ West Longitude and/or 37 degrees 55′00″ North Latitude, 75 degrees 19′18″ West Longitude; 37 degrees 54′09″**

North Latitude, 75 degrees 17′00″ West Longitude; 37 degrees 51′21″ North Latitude, 75 degrees 18′52″ West Longitude; 37 degrees 51′20″ North Latitude, 75 degrees 21′05″ West Longitude, in rem, Defendants.

No. 2:98CV281.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 27, 1999.

Anthony F. Troy, Mays & Valentine, Richmond, Virginia, David Kegebein Suteland Mays & Valentine, Norfolk, VA, Peter E. Hess, Wilmington, Delaware, David J. Bederman, Emory University School of Law, Gambrell Hall, Atlanta, Georgia, for plaintiff/counter defendant.

Lawrence R. Leonard, Office of the U.S. Attorney, Norfolk, VA, Barbara B. O'Malley, Department of Justice, Torts Branch, Civil Division, for amicus curiae United States.

George Robert Leach, Williamsburg, VA, for claimants Alpha Quest Corp. and Richard L. Cook.

Ralph Montgomery Muoio, James A. Goold, Covington and Burling, Washington, D.C., for claimant Kingdom of Spain.

## OPINION AND ORDER

CLARKE, District Judge.

This case is currently before the Court on Plaintiff Sea Hunt, Inc.'s Motion for Partial Judgement on the Pleadings and Claimant Kingdom of Spain's Motion for Summary Judgement. This matter is a dispute over the status of two shipwrecked vessels believed to be the remains of the Spanish vessels JUNO and LA GALGA, which were sunk in 1802 and 1750, respectively. Plaintiff Sea Hunt, Inc. ("Sea Hunt"), a maritime salvage company based in the Eastern Shore of Virginia, has located the shipwrecked vessels near the coast of Assateague Island and has obtained permits from the Virginia Marine Resources Commission ("VMRC"), an agency of the Commonwealth of Virginia, to conduct salvage operations and to recover historic artifacts from the wrecks. The Commonwealth of Virginia ("Virginia") has asserted a claim of ownership over the vessels, pursuant to the Abandoned Shipwreck Act of 1987 ("ASA"). See 43 U.S.C. §§ 2101–2106. Claimant Kingdom of Spain ("Spain") asserts that the wrecks of JUNO and LA GALGA have not been abandoned and remain the sovereign property of Spain. The United States has filed two statements of interest and an amicus brief in support of Spain. Although there is a factual dispute between the parties as to whether the JUNO and LA GALGA are warships, that question is immaterial and does not prevent

the Court from ruling on the current motions at this time.

Based on the arguments of the parties, pleadings, and the evidence before the Court, the Court FINDS that as a matter of law Spain has not abandoned, and therefore retains ownership over, the wreck believed to be the JUNO. The Court also FINDS, however, that Spain has expressly abandoned its claim to LA GALGA, title to which now rests with Virginia according to the ASA. Accordingly, Sea Hunt's Motion for Partial Judgement on the Pleadings is GRANTED in part and DENIED in part, and Spain's Motion for Summary Judgement is GRANTED in part and DENIED in part.

### I. Factual and Procedural Background

The following facts detailing the history of JUNO and LA GALGA are drawn primarily from the affidavit of David Beltran Catala, Counsel for Judicial Affairs of the Embassy of Spain in Washington, D.C., and are not in dispute.

#### A. The Ships

##### 1. LA GALGA

The fifty-gun frigate LA GALGA de Andalucia ("LA GALGA"), the "Greyhound" in English, was commissioned into the Spanish Navy in 1732. LA GALGA initially served as part of Spain's Mediterranean Fleet, but in 1736, she sailed for Buenos Aires to join squadrons patrolling the Atlantic and Carribean. For the next fourteen years LA GALGA served as a convoy escort, traveling mainly between Veracruz, Havana, and Spain's principal home naval base at Cadiz.

Under the command of Don Daniel Houny, an Irishman in the service of Spain, LA GALGA left Havana on its last voyage on August 7, 1750. LA GALGA was charged with escorting a convoy of merchant ships across the Atlantic Ocean to Cadiz, and carried on board the 2nd Company of the 6th Battalion of Spanish Marines. On August 18, 1750, the convoy ran into a hurricane near Bermuda. The

storm separated the ships in the convoy and forced them westward towards the American coast. During the seven-day storm, LA GALGA lost three masts and began to take on water. Efforts to lighten the ship by pushing her cannons overboard were unsuccessful, and on August 25, 1750, LA GALGA sank off the coast of the Eastern Shore near the Maryland/Virginia border. Most of her crew and passengers were able to reach land safely.

Following the wreck, Captain Houny attempted to salvage items from the wreck, but was hindered in doing so by the pillaging and looting by local residents. In November, 1750, Captain Houny was able to procure the assistance of Governor Ogle of Maryland in protecting the wreck, but before further salvage could be made a second storm came and broke up what was left of the ship, ending the salvage efforts. LA GALGA then lay undisturbed for almost 250 years, until the current salvage attempts by Sea Hunt.

### 2. JUNO

The JUNO was built in 1789. A thirty-four gun frigate, she entered the service of the Spanish Navy in 1790, and sailed with a squadron of ships across the Atlantic to Cartagena. JUNO served Spain for the next ten years in the Atlantic and Caribbean, traveling many of the same routes LA GALGA had traveled a half century earlier.

On January 15, 1802, JUNO set sail from Veracruz under the command of Don Juan Ignacio Bustillo, bound for Cadiz. A severe storm caused damage to JUNO, and forced her to put in at San Juan where she underwent repairs for seven months. On October 1, 1802, JUNO left San Juan, together with the frigate ANFIRIZA, again bound for Cadiz. JUNO's mission was to transport the Third Battalion of the Regiment of Africa, along with the soldiers' families and several other civilian

officials, back to Spain after a long period of service abroad.

On October 19, 1802, a storm arose which separated JUNO and ANFIRIZA. The storm continued, and by October 22, 1802, JUNO was taking on water. Her crew was forced to jettison her cannons in an attempt to lighten the ship. On October 25, 1802, the battered JUNO encountered the American schooner LA FAVORITA. The two ships sailed westward together in the hopes of reaching an American port in which to weather the rest of the storm. JUNO continued to take on water, however, and during a lull in the storm on October 27, 1802, Captain Bustillo ordered the passengers and crew of JUNO to begin transferring to LA FAVORITA. Only seven persons were able to transfer before the storm picked up and forced the ships apart, making further transfers impossible.

On the morning of October 28, 1802, LA FAVORITA lost sight of JUNO in a heavy fog. When the fog cleared, JUNO was gone, and would not be seen again. A total of 432 sailors, soldiers and civilians perished when JUNO sank. Although Spanish authorities ordered an investigation into the loss of JUNO, the location of the wreck was not discovered until the recent efforts by Sea Hunt.[1]

### B. Procedural History

The current action was initiated by Sea Hunt with the filing of a Verified Complaint in Admiralty *In Rem* against the two wrecks on March 11, 1998. The complaint states five counts: 1) that according to the Abandoned Shipwreck Act, the Commonwealth of Virginia is the rightful owner of the shipwrecks, and Sea Hunt is entitled to the rights granted to it by the Virginia Marine Resources Commission; 2) that Sea Hunt is entitled to a liberal

---

1. The Court notes, however, that at least one other salvage company has claimed to have found the wreck of JUNO. *See Quicksilver International, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, No. 88–618–N (E.D.Va. filed Sept. 13, 1988). *See also* discussion *infra* Section II.A.

salvage award for voluntarily recovering artifacts which are in "marine peril;" 3) that Sea Hunt is entitled to an injunction prohibiting other salvors from attempting to recover artifacts from the wrecks; 4) that based on information and belief, the two wrecks are the remains of the Spanish frigates JUNO and LA GALGA, and Sea Hunt is entitled to declaratory judgement that Spain may no longer exercise sovereign prerogative over the wrecked vessels; and, 5) that Sea Hunt is entitled to declaratory judgement stating that no government other than the Commonwealth of Virginia, including the United States or any foreign sovereign, has jurisdiction to regulate salvage operations over the two shipwrecks.

On March 12, 1998, this Court issued an Order directing that a warrant be issued for the arrest of the shipwrecked vessels and artifacts, granting to Sea Hunt exclusive rights of salvage until further notice of the Court, and directing Sea Hunt to publish a general notice of the claim, and to send specific notice of the action to both the Untied States and Spain. By separate Orders of the same date, the Court appointed Sea Hunt as special process server and substitute custodian of the wrecks.

On May 11, 1998, a motion to intervene was filed by Alpha Quest, Inc. and Richard L. Cook ("Alpha Quest/Cook"), claiming ownership over the vessels in addition to asserting several claims against Sea Hunt. On May 13, 1998, a Verified Claim and an Answer were filed by Virginia, asserting that Virginia is the rightful owner of the

wrecks under the Abandoned Shipwreck Act, and that its rights were being exercised through the permits issued to Sea Hunt by the VMRC. On May 18, 1998, the United States filed a Motion to intervene, and a claim on behalf of Spain asserting ownership of the vessels.[2] In addition, the United States filed an answer asserting the United States' own interests in exerting regulatory authority over the wrecks, which lay near the boundaries of the Assateague Island National Seashore.[3] On May 20, 1998, an intervening complaint was filed by Virginia, asserting ownership over the shipwrecked vessels. On June 2, 1998, Alpha Quest/Cook filed an answer to Sea Hunt's complaint, together with several counterclaims. Sea Hunt filed an answer to Virginia's intervening complaint on June 15, 1998, in which it admitted Virginia's ownership of the shipwrecked vessels.[4]

On August 21, 1998, the United States filed a Motion to Modify the Preliminary Injunction of March 12, 1998, in order to allow the National Park Service to regulate the salvage operations off the Assateague Island National Seashore. Also on August 21, 1998, Sea Hunt filed a motion to Strike and Dismiss the United States' motion to intervene on its own behalf, a motion in opposition to the United States' motion to intervene on behalf of Spain, and a motion for Partial Judgement on the Pleadings dismissing the claim of Spain. Also on August 21, 1998, Sea Hunt filed a motion to strike and dismiss the motion to

2. The United States sought to represent Spain's interests in the wrecks according to what it believed to be its obligations under the Treaty of Friendship and General Relations Between the United States of America and Spain, signed July 3, 1902. *See* 33 Stat. 2105.

3. The Pleadings filed by the United States were initially filed May 13, 1998 in the Alexandria Division of this Court. They were forwarded to the Norfolk Division, where they were filed on May 18, 1998.

4. On July 14, 1998, this Court entered an Order clarifying several procedural matters:

1) Sea Hunt's answer to Virginia's intervening complaint was returned because it was not signed by local counsel of record; 2) Alpha Quest/Cook's motion to intervene was denied for failure to comply with Rule 24(c); 3) Spain's claim was not properly verified according to Supp. Adm. Rule (C)(6); 4) because the claim was defective, Spain's answer was premature; and 5) the United States' motion to intervene did not include a supporting verified claim, and was therefore denied. All parties were given 10 days for supplemental filings to correct the defects, and all of the relevant pleadings were re-filed.

intervene, answer and counterclaims of Alpha Quest/Cook. This Court held a hearing on all pending motions on September 15, 1998.

At the September 15, 1998, hearing, a consent Order was entered dismissing several of Alpha Quest/Cook's counterclaims, without prejudice. On September 17, 1998 this Court entered an Order dismissing Alpha Quest/Cook's remaining claims, except for the verified claim of ownership of the vessels. *See Sea Hunt, Inc. v. Unidentified Vessel or Vessels*, 181 F.R.D. 325 (E.D.Va.1998). On September 23, 1998, this Court granted Sea Hunt's motion to strike and dismiss the United States' motion to intervene on its own behalf. *See Sea Hunt, Inc. v. Unidentified Vessel or Vessels*, 182 F.R.D. 206 (E.D.Va. 1998).[5] Finally, on September 25, 1998, the Court denied the motion to intervene filed by the United States on behalf of Spain. *See Sea Hunt, Inc. v. Unidentified Vessel or Vessels*, 22 F.Supp.2d 521 (E.D.Va.1998). In the September 25, 1998, Order, the Court held that the United States did not have the authority to act as counsel to represent Spain's interests in this matter. The Court granted Spain 90 days to obtain counsel and to make an appearance on its own behalf, and advised the United States that if it wished to assert its interests in this action, it should do so through an amicus brief or other statement of interest.[6] Action on Sea Hunt's motion for partial judgement on the pleadings was delayed to allow Spain time to obtain new counsel and to respond.[7]

Spain responded through private counsel on December 23, 1998, with a motion to intervene, a verified claim and an answer on its own behalf. At the same time, Spain filed the instant Motion for Summary Judgement, and a brief in opposition to Sea Hunt's motion for Partial Judgement on the Pleadings. Also on December 23, 1998, the United States filed a motion for authorization to file a statement of interest and an amicus brief. On January 25, 1999, Sea Hunt filed a motion to dismiss the remaining claim of Alpha Quest/Cook.

On February 24, 1999, the Court entered a consent Order extending the time for scheduling a hearing on pending motions, and allowing Spain until March 15, 1999 to file any remaining briefs.[8] At a hearing on March 5, 1999, the Court granted the United States' motion to file an amicus brief and statements of interest, and scheduled arguments on all pending motions for April 1, 1999.

## II. Preliminary Motions

Before the Court addresses the merits of the motion for partial judgment on the pleadings and the motion for summary judgment, the Court must dispose of one preliminary matter and three additional procedural motions brought by the parties.

### A. Quicksilver

As a preliminary matter, the Court notes that it has pending before it another case in admiralty, *Quicksilver International, Inc. v. The Unidentified, Wrecked and*

---

**5.** The September 23, 1998, Order was later modified by an Amended Opinion and Order on October 29, 1998. The modification was merely to clarify the Court's language, and did not affect the substance of the original Order.

**6.** The United States initially filed a notice of appeal of the September 25 Order, but withdrew the appeal on February 10, 1999, thus relieving this Court of any jurisdictional concerns it had during the pendency of the appeal. *See Sea Hunt v. Unidentified, Shipwrecked Vessel or Vessels, etc.*, No. 2:98cv281

(E.D.Va. March 5, 1999) (Order asserting jurisdiction).

**7.** In "an abundance of caution," Sea Hunt filed a motion to renew its motion for partial judgement on the pleadings on February 16, 1999, after Spain had made an appearance through its own counsel. As the Court never dismissed Sea Hunt's original motion, the motion to renew was unnecessary.

**8.** In addition, the February 24, 1999, Order waived the page limitations for briefs contained in Local Rule 7.

*Abandoned Sailing Vessel,* No. 88–618–N (E.D.Va. filed Sept. 13, 1988), in which this Court, in 1988, awarded to Quicksilver International, Inc. ("Quicksilver") exclusive salvage rights to an unidentified shipwrecked vessel located off the coast of Maryland. Subsequent to the Court's award of salvage rights in that case, Quicksilver reported to the Court that based on its salvage operations and its investigation of other historical data, it believed the shipwreck it was salvaging to be the remains of the Spanish vessel JUNO. Sea Hunt, of course, believes that one of the shipwrecks that is the subject of the case at bar is, in fact, JUNO.

Prior to the April 1, 1999, hearing in the case at bar, the Court notified counsel for Quicksilver and counsel for Sea Hunt that both salvors or potential salvors were making claims to a Spanish vessel named JUNO. The Court requested that counsel for Quicksilver attend the April 1, 1999, hearing to assure the Court that the shipwrecks at issue in the two cases were indeed two separate and distinct shipwrecks. At the hearing, counsel for Quicksilver and Sea Hunt adequately assured the Court that they had conferred, compared locations, and determined that their clients were making claims against and were concerned with different shipwrecks. Counsel for Spain indicated that Spain believed that Sea Hunt, and not Quicksilver, had found the actual JUNO.

### B.  Alpha Quest/Cook

The only claim that Alpha Quest/Cook has remaining in this case is a verified claim of ownership to the sunken vessels. Sea Hunt filed a motion to dismiss this claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure based on their contention that Alpha Quest/Cook had made inconsistent factual representations to the Court with regard to the question of

ownership. The Court need not reach that issue because at oral argument, counsel for Alpha Quest/Cook admitted to the Court that their only interest in this case was that of obtaining some sort of salvage award from Sea Hunt based on the aid that Alpha Quest/Cook allegedly gave to Sea Hunt in obtaining salvage permits from Virginia. Alpha Quest/Cook admitted to the Court that they have no basis for asserting any claim of ownership or salvage rights over the sunken vessels. Consequently, when the Court suggested that Alpha Quest/Cook's best course of action would be to assert any claims they may have in a private action against Sea Hunt, Alpha Quest/Cook agreed. Thus, the Court hereby GRANTS Sea Hunt's motion to dismiss Alpha Quest/Cook and DISMISSES Alpha Quest/Cook's Verified Claim, without prejudice to Alpha Quest/Cook's right to bring certain other claims against Sea Hunt in a separate action.[9]

### C.  Sea Hunt's Motion to Strike Spain's Verified Claim

■  Sea Hunt has filed a motion to strike the verified claim of Spain on the grounds that Spain has failed to comply with Supplemental Admiralty Rule C(6) and with Local Admiralty Rule (e)(3) of the Eastern District of Virginia. Sea Hunt argues that Spain failed to verify its claim of ownership either under oath or by solemn affirmation in accordance with 28 U.S.C. § 1746. In response, Spain conditionally filed an amended verified claim which corrected the alleged defects.

Rule C(6) requires that a claim in admiralty "shall be verified on oath or solemn affirmation...." Fed.R.Civ.P. C(6). Local Rules require that a complaint in admiralty filed under Rule (C) "shall be verified on oath or solemn affirmation by a party or by an authorized officer of a corporate party." LAR (e)(3). If a party chooses to

---

9.  The Consent Order entered by this Court on September 15, 1998, dismissed Counts I, II, and III, and subparagraphs (b), (f), (g), and (h) of the prayer of counterclaim without prej-

udice. These are the only claims remaining from the original complaint which Alpha Quest/Cook may assert against Sea Hunt; all other claims were dismissed with prejudice.

verify the document by solemn affirmation, 28 U.S.C. § 1746 provides a method by which an unsworn document may nonetheless qualify as a properly verified document: the declarant must explicitly state that the statements contained therein are executed "under penalty of perjury." *See* 28 U.S.C. § 1746.

In Spain's Verified Complaint, David Beltran Catala, Counsel for Judicial Affairs of the Embassy of Spain in Washington, D.C., attempts to verify Spain's claim of ownership merely by stating that the claim is "[s]ubscribed to under oath...." This verification shows neither that a formal oath was administered by one authorized to administer such oath nor that the document was signed "under penalty of perjury." Thus, this verification does not comply technically with either form of verification available under the admiralty rules.

Since the verification does not comply technically with the mandates of the pertinent admiralty rules, Sea Hunt's motion to strike the verification is GRANTED. In the interests of justice, however, the Court also GRANTS Spain's conditional motion to file an amended verification and DENIES Sea Hunt's request for dismissal of the now properly filed verified claim.

### D.  Factual Disputes

Finally, Spain has brought a motion to strike the "Notice of Filing" ("Notice") and accompanying affidavits submitted by Sea Hunt on March 15, 1999. In the Notice and affidavits, Sea Hunt asserts, arguably for the first time in this litigation, that JUNO and LA GALGA were not warships at the times of their respective sinkings and therefore not entitled to the special status and protections that the law affords to warships. Spain asserts that the factual issue Sea Hunt wishes to raise at this late stage of the litigation is not a "genuine" issue of material fact that would allow Sea Hunt to avoid summary judgment, *see*

Fed.R.Civ.P. 56(c), but rather a "contrived" issue of fact created by Sea Hunt as a last minute attempt to avoid summary judgment. Spain argues further that Sea Hunt's affidavits clearly contradict the factual position that Sea Hunt has taken since the inception of this litigation.

The Court is concerned as to why Sea Hunt waited so long to bring this potential factual dispute to the Court's attention. However, for reasons set forth more thoroughly in the Opinion below, the Court finds it unnecessary to the disposition of this case to decide whether LA GALGA and JUNO were indeed warships at the time of their respective sinkings. Therefore, the Court DECLINES to rule on Spain's motion.

### III.  Abandonment of JUNO and LA GALGA

### A.  Definition of Abandonment

The crux of this case is the issue of abandonment. There is no doubt that at one point in time JUNO and LA GALGA belonged to Spain. The current ownership of the shipwrecks depends on whether Spain has abandoned its claim to the two vessels. Virginia's, and by extension Sea Hunt's, claim rests on the Abandoned Shipwreck Act of 1987 ("ASA"), a federal act. Under the ASA:

> [t]he United States asserts title to any abandoned shipwreck that is—
>
> (1) embedded in submerged lands of a State....

43 U.S.C.A. § 2105(a)(West Supp.1998). Title over a shipwreck covered under the ASA is transferred to the State in whose waters the wreck is located. *See* 43 U.S.C. § 2105(e). Thus, if this Court finds that JUNO and LA GALGA have at any time been abandoned by Spain, then according to the ASA, the wrecks belong to Virginia.[10] If, on the other hand, the Court finds that Spain has never abandoned JUNO and LA GALGA, then Spain retains

---

**10.**  No party in this case has argued or otherwise implied that the wrecks of JUNO and LA

GALGA are not "embedded in the submerged lands" of Virginia.

ownership over them. The ASA itself does not provide a definition of "abandonment." Therefore, the Court must look to case law for guidance on determining the status of the shipwrecked vessels in this case.

The Fourth Circuit Court of Appeals has dealt extensively with the issue of abandonment in the case of *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.,* 974 F.2d 450, 461 (4th Cir.1992), *cert. denied,* 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993) ("Columbus–America"). That case is binding authority in this Court, and will be discussed in detail.

B. *Columbus–America Discovery Group*

*Columbus–America* involved the wreck of the S.S. CENTRAL AMERICA. The salvage of the wreck of the CENTRAL AMERICA has been the subject of considerable litigation.

The CENTRAL AMERICA sank during a storm in 1857 while on a journey from Havana to New York, loaded with passengers and gold from the California gold rush. The demise of the CENTRAL AMERICA was widely reported, not only because of the 425 passengers who died, but also because of the fortune in commercial and privately owned gold which was lost. The commercial shipments of gold were insured, and the underwriters promptly paid the claims arising from the wreck. The payment of the claims vested title to the gold in the underwriters, who unsuccessfully attempted to organize salvage efforts. Because the location and depth of the wreck was unknown, no serious attempts at salvage were mounted.

Beginning in the 1970s, interest in salvaging the wreck revived, and new technology made such an expedition feasible

for the first time. Several private parties sought a relinquishment of the underwriters' rights to the gold. Although the underwriters negotiated with potential salvors, no agreements were ever reached. Finally, in 1987, the Columbus–America Discovery Group ("CADG") located the wreck in over 8000 feet of water, and filed an *in rem* action against the wreck on May 27, 1987, in this Court.[11] On September 29, 1989, the insurance underwriters filed claims with the court asserting their rights of ownership.[12] After a ten-day trial, the district court found that because the underwriters had apparently destroyed documents pertaining to the payment of claims on the CENTRAL AMERICA, and 130 years had passed without the underwriters attempting to claim the sunken cargo, their claim to the gold had been abandoned. Pursuant to the law of finds, the Court awarded the gold in its entirety to CADG. *See Columbus–America Discovery Group, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 742 F.Supp. 1327 (E.D.Va.1990).

On appeal, the Fourth Circuit closely examined the law of salvage versus the law of finds as used by the district court. Salvage law, according to the Court, is applied "when ships or their cargo have been recovered from the bottom of the sea by those other than their original owners." *Columbus–America,* 974 F.2d at 459. Under salvage law, "the original owners still retain their ownership interests in such property...." *Id.* The law of finds, in contrast, "expresses the ancient and honorable principle of finders, keepers," *Id.* (*quoting Martha's Vineyard Scuba HQ, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059, 1065 (1st Cir.1987)), and applies "only to maritime property which had never been owned by anybody...." *Id.* The Court

---

11. After two years of salvage, CADG realized that they had found the wrong ship. Eventually, they discovered the actual wreck of the CENTRAL AMERICA, and obtained a salvage injunction for the new wreck site on August 18, 1989.

12. The Superintendent of Insurance of the State of New York also appeared on behalf of several defunct insurance companies.

noted a "relatively recent trend in the law" which had "seen the law of finds applied to longlost and abandoned shipwrecks." *Id.* at 460. Finally, the Court recognized that "[c]ourts in admiralty favor applying salvage law rather than the law of finds." *Id.*

Having determined that "finds law is applied to previously owned sunken property only when that property has been abandoned by its previous owners," *Id.* at 461, the Court turned to a discussion of abandonment. According to the Court, abandonment in the case of a shipwreck "means much more than merely leaving the property, for it has long been established that when articles are lost at sea the title of the owner in them remains." *Id.* (quotations omitted). Furthermore, after a ship has been sunk, "lapse of time and nonuser are not sufficient, in and of themselves, to constitute abandonment." *Id.* (quotations omitted).

The Fourth Circuit in *Columbus–America* divided cases which applied the law of finds to shipwrecks into two categories. First were "cases where owners have expressly and publicly abandoned their property." *Id.* Second were cases where "no owner appears in court" to claim the shipwrecks. *Id.* Significantly, the Court pointed out that in the second category of cases, the absence of an owner:

> may give rise to an inference of abandonment, but should an owner appear in court and there be no evidence of an express abandonment, the law of salvage must be applied.

*Id.*

The Court then observed that the district court's opinion:

> appears to be the only reported decision involving salvaged treasure from ancient shipwrecks wherein a court has applied the law of finds despite the fact that the previous owner appeared in court. In

all other finds law cases, no prior owner has appeared.

*Id.* at 462. A review of other finds law cases confirmed the Court's observation. The Court specifically discounted language from the Fifth Circuit in *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978), which indicated that lapse of time was a sufficient criteria for applying the law of finds,[13] because the court in *Treasure Salvors* made a point of noting that Spain, the previous owner of the wrecked vessel, had not appeared in court to assert an ownership claim.

Finally, after its extensive review of applicable law, the *Columbus–America* Court came to the following conclusion:

> [W]hen sunken ships or their cargo are rescued from the bottom of the ocean by those other than the owners, courts favor applying the law of salvage over the law of finds. Finds law should be applied, however, in situations where the previous owners are found to have abandoned their property. Such abandonment must be proved by clear and convincing evidence, though, such as an owner's express declaration abandoning title. Should the property encompass an ancient and longlost shipwreck, a court may infer an abandonment. Such an inference would be improper, though, should a previous owner appear and assert his ownership interest; in such a case the normal presumptions would apply and an abandonment would have to be proved by strong and convincing evidence.

*Id.* at 464–65.

The Fourth Circuit in *Columbus–America* then held that the underwriters had not abandoned their claim to the gold, finding that after 134 years, the fact that documents proving the underwriters payment of claims could no longer be found

---

**13.** *See Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 337 (5th Cir.1978) ("[d]isposition of a wrecked vessel whose very location has been lost for centuries as though its owner were still in existence stretches a fiction to absurd lengths.")

was not enough to show an express abandonment under the "strong and convincing evidence" standard. *Id.* at 468.[14]

The statement of the law of abandonment by the Court in *Columbus–America* could not be clearer. Although the Court clearly allows for an inference of abandonment for shipwrecks which have been lost and undiscovered for some time, in a case where the original owner appears, abandonment may not be inferred, but must be proven, regardless of how long the ships have been lost, and regardless of the character of the vessel. The *Columbus–America* case makes no distinction between private vessels and public vessels such as warships. Because of the assertion of a universal rule of express abandonment, it is irrelevant in this case for the purpose of determining abandonment whether JUNO and LA GALGA were warships in the service of Spain at the time of their sinking.

*Columbus–America* is binding on this Court. Even so, this Court notes that it is not the only authority for a rule of express abandonment when an owner of a shipwreck appears in court to make a claim. In *Zych v. Unidentified, Wrecked and Abandoned Vessel, Believed to be the "Lady Elgin"*, 755 F.Supp. 213 (N.D.Ill. 1990), like in *Columbus–America*, an insurance company claimed ownership of a shipwreck on which it had paid claims at the time of the ship's sinking, in 1860. The court in *Zych* found that despite the fact that the insurers never attempted to locate or salvage the wreck, there was no evidence of an affirmative act "which indicates an intent by [the insurer] to abandon the wreck," and therefore the insurers retained title to the wreck. *Id.* at 216. Thus, in the only two cases which the Court has located in which the owner of a shipwrecked vessel has appeared to claim

ownership, a rule of express abandonment has been applied.

The implication of the *Columbus–America* rule in this case is that, whether or not JUNO and LA GALGA are considered warships, their owner, the Kingdom of Spain, has appeared to claim ownership to them, and therefore Sea Hunt, in pressing its claim for possession of the vessels under the law of finds, must show by "strong and convincing evidence" that the shipwrecks have been expressly abandoned by Spain. *Columbus–America*, 974 F.2d at 465. Unless Sea Hunt can do so, the Court must apply the law of salvage, which operates under the premise that "the original owners still retain their ownership interests in such property." *Id.* at 459.

## IV. Applying the Express Abandonment Rule

Sea Hunt presents three grounds on which JUNO and LA GALGA have been expressly abandoned by Spain. First is the Definitive Treaty of Peace Between France, Great Britain and Spain, Fr.–Sp.–Gr. Brit., Feb. 10, 1763, 278 Parry's Consol. T.S. 279 ("1763 Treaty"). Second is the Treaty of Amity, Settlement and Limits Between the United States of America and His Catholic Majesty (the Kingdom of Spain), U.S.–Sp., Feb. 22, 1819, 8 Stat. 252, T.S. No. 327, 11 Bevans 528 ("1819 Treaty"). The third ground is the declaration of war by Spain against the United States in 1898.

### A. 1763 Treaty

■ The 1763 Treaty between Great Britain, Spain and France ended the Seven Years War (also called the French and Indian War), and transferred several of Spain's territories in the new world to Great Britain. Sea Hunt claims that Article XX of the 1763 Treaty constitutes an express abandonment of LA GALGA:[15]

---

14. CADG was, however, granted the right to compensation under the law of salvage, and the case was remanded for a determination of the amount of the salvage award. *Id.* at 468.

15. Because JUNO was not wrecked until 1802, its status is not affected by the terms of the 1763 Treaty.

His Catholick Majesty cedes and guaranties, in full right, to his Britannick Majesty, Florida with Fort St. Augustin, and the Bay of Pensacola, as well as all that Spain possesses on the continent of North America, to the East or to the South East of the river Mississippi. And, in general, everything that depends on the said countries and land, with the sovereignty, property, possession, and all rights, acquired by treaties or otherwise, which the Catholick King and the Crown of Spain have had till now over the said countries, lands, places, and their inhabitants; so that the Catholick King cedes and makes over the whole to the said King and to the Crown of Great Britain, and that in the most ample manner and form ... It is moreover stipulated, that his Catholick Majesty shall have power to cause all the effects that may belong to him, to be brought away, whether it be artillery or other things.

1763 Treaty, Art. XX.[16]

This clause is a sweeping grant of territory and property from Spain to Great Britain. Spain not only gave Great Britain its claims in Florida, but also "all that Spain possesses on the continent of North America, to the East or to the South East of the river Mississippi." In addition, not only the land was ceded, but "everything that depends" on the land.

These cessions were part of a wholesale redrawing of the map of North America by the three great colonial powers of 1763, Great Britain, France, and Spain. For example, in a like provision to Article XX, France ceded to Great Britain all of its possessions in Canada. See 1763 Treaty, Art. IV. France was allowed to keep its territory west of the Mississippi, including New Orleans, see Id., Art. VII, while Great Britain returned to France several islands in the Carribean which had been conquered during the preceding war. See Id., Art. VIII. In return for ceding all of

Spain's possessions in North American east and southeast of the Mississippi River to Great Britain, the territory of Cuba was returned to Spain. See Id., Art. XIX. Great Britain was the clear victor in North America, and the various terms of the Treaty imply that Great Britain was intended to have complete dominion over all of North America east of the Mississippi River.

The sweeping language of Spain's cession in Article XX, together with the background of the complete change of sovereignty in the North American colonies, makes it unlikely that Spain intended to, or would have been allowed by Great Britain to maintain a claim of ownership over the wreck of LA GALGA off the coast of Virginia. Spain had ceded its rights over everything it owned in North America east of the Mississippi, including its rights to sunken vessels.

Furthermore, both Spain and Great Britain actually knew where LA GALGA was located, and that it would be included in the cession of property. LA GALGA was wrecked close to land, and her captain and crew had attempted to salvage much of what was left of the ship. In addition, Captain Houny called on the Governor of the colony of Maryland for assistance in keeping away the public while salvage was taking place. However, after a second storm arose and halted salvage efforts, they were never revived.

The last sentence of Article XX reserves for the King of Spain the right to "cause all the effects that may belong to him, to be brought away, whether it be artillery or other things." As has been discussed above, Spain knew the location of LA GALGA. Yet Spain made no attempt to "bring away" any of the remains of LA GALGA after the Treaty was signed. Thus, Spain waived the right to maintain its ownership over LA GALGA by failing to carry it away, and it was ceded with the

16. The Court has not quoted parts of Article XX dealing with the right of Spanish subjects in the ceded territory to keep their personal possessions and to continue to practice Catholicism unhindered by their new government.

rest of Spain's possessions to Great Britain.[17]

Article XX of the 1763 Treaty constitutes "strong and convincing evidence" under the *Columbus–America* standard of an express abandonment by Spain of its title to LA GALGA. LA GALGA is consequently an abandoned shipwreck, and belongs to Virginia under the terms of the Abandoned Shipwreck Act.

### B.   Treaty of 1819

■ The 1819 Treaty ended the conflict between Spain and the United States arising out of the War of 1812. The purpose of the 1819 Treaty was to "designate with precision the limits of their respective bordering territories in North America." 1819 Treaty, Preamble. The key provision of the 1819 Treaty is Article 2, which effected a transfer of territory from Spain to the United States:

> His Catholic majesty cedes to the United States, in full property and sovereignty, all the territories which belong to him, situated to the Eastward of the Mississippi, known by the name of East and West Florida. The adjacent Islands dependant on said Provinces, all public lots and squares, vacant Lands, public Edifices, Fortifications, Barracks and other Buildings, which are not private property . . . .

1819 Treaty, Article 2.[18] This provision is much narrower than Article XX of the 1763 Treaty. In the 1819 Treaty provision, Spain specifically ceded only "territories," namely Florida, and not "all that

Spain possesses" as in the 1763 Treaty. Nothing in Article 2 implies that Spain has ceded anything other than territory and the structures erected on that territory. Also, even though the 1819 Treaty again uses the description of territory "Eastward of the Mississippi," similar to the 1763 Treaty, it goes on to clarify that the territory being described is only that which is "known by the name of East and West Florida." As JUNO is located in Virginia and not Florida it is not affected by this Treaty.[19] Thus, Spain did not expressly abandon JUNO through the 1819 Treaty.

### C.   The Spanish–American War of 1898

■ In addition to the two treaties, Sea Hunt argues that the declaration of war between Spain and the United States in 1898 operated as an express abandonment of Spanish property in the United States. The existence of a state of war with Spain gave the United States the right to confiscate Spanish vessels in United States waters, and this right was exercised. By proclamation of April 26, 1898, President McKinley gave Spanish merchant vessels until May 21, 1898 to leave United States waters, or be confiscated:

> Spanish merchant vessels, in any ports or places within the United States, shall be allowed till May 21, 1898, inclusive, for loading their cargoes and departing from such ports or places; and such Spanish merchant vessels, if met at sea by any United States ship, shall be permitted to continue their voyage, if, on examination of their papers, it shall appear that their cargoes were taken on

**17.** It is argued by Spain that the final provision of Article XX had no deadline and that the King of Spain could remove his property at any time. However, this would lead to the unlikely scenario that Great Britain intended to allow Spain to keep its "artillery and other things" in British territory indefinitely.

**18.** It should be noted that this is the second time that Spain has ceded Florida. Spain initially ceded Florida to Great Britain in the Treaty of 1763. During the American Revolution, however, Spain recaptured Pensacola, and all of Florida was given back to Spain by

treaty in 1784. In 1819, Spain again ceded Florida, this time to the United States. *See A Short History of Florida*, (visited Apr. 22, 1999) <http://dhr.dos.state.fl.us/flafacts/shorthis.html>.

**19.** As LA GALGA was abandoned by the 1763 Treaty, it is not necessary to discuss its status under the 1819 Treaty. However, as it is located very near JUNO, it is clear that the two wrecks would be treated the same under this Treaty, and therefore neither was abandoned by the 1819 Treaty.

board before the expiration of the above term; provided that nothing herein contained shall apply to Spanish vessels having on board any officer in the military or naval service of the enemy....

30 Stat. 1770–71.

Neither party doubts that the President had the power to order confiscation of Spanish merchant vessels at the outbreak of war. There is a question, however, of whether the Untied States had the right to confiscate Spanish warships, and whether President McKinley intended to do so through the Proclamation. Sea Hunt contends that the Proclamation issued by President McKinley did not mention warships, because it was clear under international law that warships were automatically forfeited. Spain argues to the contrary that the Proclamation did not apply to warships, as it was restrained by its language to merchant vessels. In any event, it is clear to the Court that it is within the bounds of the law to confiscate a warship or a merchant vessel belonging to the enemy during time of war. *See The Panama*, 176 U.S. 535, 20 S.Ct. 480, 44 L.Ed. 577 (1900); *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *United States v. Dewey*, 188 U.S. 254, 23 S.Ct. 415, 47 L.Ed. 463 (1903); *See also Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796). What is equally clear to the Court is that such confiscations are not automatic; and that an enemy vessel must actually be seized in order to be forfeited.

■ It has long been the law in the United States that a declaration of war alone does not work to seize enemy property. In *Brown v. United States*, 12 U.S. (8 Cranch) 110, 3 L.Ed. 504 (1814), Chief Justice Marshall articulated that rule as follows:

It may be considered as the opinion of all who have written on the *jus belli*, that war gives the right to confiscate, but does not itself confiscate the property of the enemy ...

*Id.* at 125. Moreover:

The proposition that a declaration of war does not, in itself, enact a confiscation of the property of the enemy within the territory of the belligerent, is believed to be entirely free from doubt.

*Id.* at 127.

In contemporaneous cases dealing with the confiscation of Spanish vessels during the 1898 war, the vessels were explicitly captured by United States warships. *See The Panama*, 176 U.S. 535, 20 S.Ct. 480, 44 L.Ed. 577 (1900)(Spanish mail ship captured near Cuba by U.S. warship); *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (Two Spanish fishing vessels captured by U.S. blockading squadron near Cuba). Significantly, this is also the case for confiscation of enemy warships sunk in battle.) *See United States v. Dewey*, 188 U.S. 254, 23 S.Ct. 415, 47 L.Ed. 463 (1903) (Spanish warships during the Battle of Manila Bay raised and captured as prizes by ships of the U.S. fleet); *See also United States v. Steinmetz*, 973 F.2d at 217 (no such doctrine as 'constructive capture,' captor must have actual control over enemy ship to establish capture before sinking).

Whether JUNO was a warship or merchant ship is irrelevant in deciding this issue. There is no allegation by Sea Hunt that the United States had actual control over the wrecks at any time during the hostilities of 1898, or thereafter. Without such actual possession by the United States, JUNO was not abandoned by Spain during the Spanish–American War of 1898. Thus, Spain retains ownership over JUNO.

### IV. Conclusion

Regardless of whether or not JUNO and LA GALGA are considered to be warships, they are subject to a rule of express abandonment under the Fourth Circuit's precedent in *Columbus–America*. Sea Hunt has succeeded in showing by "strong and convincing" evidence that, through the 1763 Treaty, Spain has expressly abandoned title to LA GALGA. Therefore, title to LA GALGA now lies with Virginia

under the Abandoned Shipwreck Act, and Sea Hunt may continue with its salvage efforts according to the terms of the VMRC permits. There has been no such evidence of abandonment, however, as to JUNO. Neither the 1819 Treaty nor the declaration of war in 1898 contain any evidence of an abandonment of JUNO by Spain. Therefore Spain retains title to JUNO's wreck, and Virginia has no claim to JUNO under the Abandoned Shipwreck Act. Sea Hunt may not, without Spain's permission, continue salvage operations on the remains of JUNO.

The question remains as to whether Sea Hunt is entitled to a salvage award for JUNO under traditional salvage law. Spain has specifically indicated that it wishes to treat JUNO as a maritime grave and does not want the wreck to be salvaged. As this issue has not been fully argued by the parties, the question of whether Sea Hunt is entitled to an award under salvage law for salvage work performed on JUNO is expressly RESERVED, pending supplemental briefing by the parties. Each party to the case is ORDERED to submit a supplemental brief on the issue of whether Sea Hunt is entitled to a salvage award for JUNO within 30 days of the entry of this Order. The Court may require further evidence concerning the extent of the salvage conducted on JUNO. Amicus United States is also granted leave to submit a brief on this issue if it so chooses.

It is ORDERED, as to Spain's Motion for Summary Judgement that Spain retains title to and ownership of JUNO, and that its claim of ownership and title to LA GALGA is DENIED and DISMISSED. It is further ORDERED that Sea Hunt's Motion for Partial Judgement on the Pleadings is GRANTED to the extent that the Commonwealth of Virginia owns and has title to LA GALGA and was acting in accord with existing authority in issuing a salvage permit to Sea Hunt for LA GALGA.

The Clerk is DIRECTED to send a copy of this Order to all counsel of record in this case, as well as to counsel for Quicksilver.

IT IS SO ORDERED.