## Case No. 15,854.

### UNITED STATES v. The NANCY.

### SAME v. The CAROLINE.

[3 Wash. C. C. 281.] [2]

Circuit Court, D. Pennsylvania. April Term, 1814.

NON INTERCOURSE—PROHIBITED ARTICLES—CONTINUITY OF VOYAGE—INTENT IN LADING.

1. The prohibited articles, the importation or the putting on board of which, with intent to import the same, is made a cause of forfeiture by the 5th section of the act of March 1, 1809 [2 Stat. 529], are, as well those which are prohibited on account of the place at which they were laden, as those which are the growth, produce, or manufacture, of the offending nation.

2. Although the merchandise, which is the subject of this information, was landed, and the duties paid thereon, at Amelia Island, in Florida, and thence trans-shipped to Philadelphia—yet, as the goods were originally put on board the vessel, with intention to import them into the United States, no question can arise as to the continuity of the voyage; the offence under the law consisting, not in the importation, but in the intention with which the merchandise was put on board.

3. The non-importation law of March 2, 1811 [2 Stat. 651], which revived the act of March 1, 1809, the provisions of which extended to the possessions, as well as the colonies and dependencies, of Great Britain, did not extend to the possessions, but only to the colonies and dependencies of that power.

4. Malta was not a dependency of Great Britain.

[Appeal from the district court of the United States for the district of Pennsylvania.]

WASHINGTON, Circuit Justice. These are informations, filed on behalf of the United States, against the brig Nancy and her cargo, and also against the cargo of the Caroline, for breaches of the non-importation laws of the United States. The Nancy is claimed by an American citizen; and the goods in the two vessels are claimed by Willing & Francis, for themselves, and on account of certain persons residing at Malta. The facts, in these cases, are—that the goods imported into the port of Philadelphia in these vessels, were shipped at the island of Malta, in the ship Union, by the jurats of the university of the four cities of Malta, some time in the month of February, 1811, consigned to Willing & Francis at Philadelphia, to be sold by them, and the proceeds to be invested in a return cargo of flour. It appears, by the letters from the shippers of this cargo to their consignees, that in case the non-importation law as to Great Britain should be renewed, the Union, with the cargo on board, was to be ordered to Amelia Island, where her cargo was to be taken out and replaced by a cargo of flour, which the consignees were to send forward to that place. On the 6th of May, 1811, Willing & Francis received information of this consignment, and immediately sent orders to the master of the Union, who had then arrived on the coast of the United States, to proceed to Amelia Island; to which place, they informed him, they would despatch two vessels with flour, to load the Union, and also to receive her cargo to bring to Philadelphia. The flour was accordingly sent to Amelia Island in these two vessels, the Nancy and the Caroline, in which the cargo of the Union was imported into Philadelphia, some time in August, 1811. A pro forma decree having been made by the district court, dismissing the information [case unreported], appeals were entered to this court.

The questions arising in these causes, are —(1) Was the cargo of the Union, in whole or in part, the growth, produce, or manufacture, of the island of Malta? (2) Was the importation into the United States to be considered as having been made from that island, or from Amelia Island? (3) Was the island of Malta a dependence of Great Britain?

1. As to the first question, there can be no doubt, upon the evidence, that the articles composing this cargo are not produced in the island of Malta for exportation; and that this particular cargo was imported into that island from Italy and other places, not belonging in any respect to the British government.

2. In order to arrive at a clear understanding of the subject, to be considered under the second head of argument; it will be proper to take a brief view of the different acts of congress, which interdicted commercial inter-

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

course between the United States and Great Britain.

The act of March 1, 1809, prohibits, after the 20th of May following, the importation into the United States, of any goods, &c., wherever grown or manufactured, from any port or place situated in Great Britain, or France, or in any of the colonies, or dependencies; or in the actual possession of either of those nations. It also prohibits the importation of any goods, being the growth, produce, or manufacture of those countries, or of their colonies, dependencies, or places, in their actual possession, from any port whatever. The 5th section of this law declares, that all such prohibited articles, imported into the United States, contrary to the true intent and meaning of the act, or which should be put on board of any vessel, with intention of importing the same into the United States, together with all other articles on board of the same vessel, belonging to the owner of the prohibited articles; should be forfeited. The sixth section provides, that if the said prohibited articles should be put on board, with intent to import the same into the United States, with the knowledge of the owner, or master of such vessel, the vessel also should be forfeited. The operation of this law as against Great Britain, was suspended for a short time, by the president's proclamation, issued on the 19th of April, 1809 (5 Am. Reg.), in consequence of the arrangement with Mr. Erskine; and was to take effect on the 10th of June following—and was again revived by proclamation, dated the 9th of August, 1809. But it at length expired, by its own limitation, in May, 1810, no law having been passed, during that session, further to continue it. By the act of May 1, 1810 [2 Stat. 605], it was however declared, that in case either Great Britain or France should, before the 3d of March, 1811, so revoke or modify her edicts, as that they should cease to violate the neutral commerce of the United States—which fact, the president was to declare, by proclamation; and if the other nation should not, within three months thereafter, do the same thing, in relation to her edicts, that the 3d, 4th, 5th, 6th, 7th, 8th, 9th, 10th, and 18th sections of the act of March 1, 1809, should, from the expiration of the said three months from the date of the said proclamation, be revived against the dominions, colonies, and dependencies, and the articles the growth, produce, or manufacture of the dominions, colonies, and dependencies of the nation so refusing, or neglecting to revoke, or modify her edicts; and that the restrictions imposed by this act, (which relate only to the prohibition of our waters to the armed vessels of those two nations,) should, from the date of the proclamation, cease, in relation to the nation so revoking her decrees. On the 2d of November, 1810, the president issued his proclamation, declaring that France had complied with the conditions of the law of the 1st of May, 1810; in consequence of which, the above sections of the act of March 1, 1809, were brought into operation against Great Britain, her colonies and dependencies, to take effect from the 2d of February, 1811, unless, before that time, Great Britain should repeal her offensive edicts. Then came the act of March 2, 1811, which enacted, that until the president should, by his proclamation, declare, that Great Britain had revoked, or so modified her edicts, as that they had ceased to violate the neutral commerce of the United States, the provisions of the above sections of March 1, 1809, should have full force, and be immediately carried into effect against Great Britain, her colonies and dependencies.

From this view of the above laws, the two following positions appear to the court to be perfectly clear; 1st, that the prohibited articles, the importation of which, or the putting on board of which, with intention to import the same into the United States, is made, by the fifth section of the act of the 1st of March, 1809, a cause of forfeiture, are, as well those which are prohibited on account of the place at which they were put on board, as those which are the growth, produce, or manufacture of the offending nation. The object of the law was to interdict all commerce with the ports, as well as in the products of Great Britain and France, so far as related to importations into the United States; and a violation, or intention to violate this policy of our government, was, in reason, as well as by the plain construction of the law, made punishable in either case. If then the island of Malta should be determined to be a prohibited place, and the intention of the owners of this cargo, at that place, was to import the same into the United States; or, without such intention being proved, the importation was made, either directly or indirectly; the forfeiture was complete, as soon as the cargo came within the jurisdiction of the United States, notwithstanding the landing, and paying of duties, at Amelia Island, and the trans-shipment at that place, for the port of Philadelphia. In the latter case, that is, of an original importation, from Malta to Amelia Island; there can be no doubt, but that if the cargo had been bona fide sold at Amelia Island, the purchaser might have imported it into the United States, without incurring a forfeiture; because the continuity of the voyage, from the forbidden place, would have been substantially broken, and not in form merely. Contrivances to evade a law, may sometimes be so deeply laid, as to elude detection, notwithstanding the strictest examination of all the circumstances that can be brought to light. But whenever it is made clearly to appear, that the law, in its obvious spirit and intention, has been violated by covert means, a court of justice would forget its duty, by affording its sanction to such contrivances. But, when it appears, that the cargo was originally put on board, with intent to import the same into the Unit-

ed States, no question, it is conceived, can arise, as to the continuity of the voyage; for here the offence consists, not in the importation, but in the intention with which the cargo was put on board. Now, as to the facts in this case, there can be no doubt. The letters from the owners at Malta, to their consignees, and from those consignees to the master of the Union, and to their agent at Amelia Island, as also to the person whom they sent in the Nancy—all prove clearly, that the cargo was put on board at Malta, with an intention to import the same into the United States; directly, if the laws would permit; and if not, then indirectly, by trans-shipping it at Amelia Island.

The second position which arises out of the view before taken, of the different acts of congress on this subject, is, that the non-importation law of March 1, 1809, which interdicted commerce with the possessions, as well as with the colonies and dependencies of Great Britain, was revived only against that nation, her colonies, and dependencies; and this conducts us to the third and most difficult question in the cause. Is Malta to be considered as a dependence of Great Britain? In deciding this question, the court has not had an opportunity to derive much information from books. The precise meaning of the word "dependency," as it is used by congress, in the law under consideration, cannot be ascertained with any degree of certainty. It may, however, be safely concluded, that it imports some civil and political relation, which one country bears to another, as its superior, different from that of a mere possession. The introduction of the words "actual possession," into the act of March 1, 1809, and the omission of them in that of May 1, 1810, afford strong evidence, that congress did not consider a dependency, as synonymous with a possession; but, on the contrary, the difference was so material, as to induce congress to sanction a trade with the former, which had been previously interdicted with both. As soon as this distinction is established, the mind of a legal man is irresistibly led to annex to the one, the idea of possession, accompanied by title, in opposition to a mere naked possession, obtained either by force, and against right, or rightfully acquired, and wrongfully withheld from the legal sovereign; and this, the court is strongly inclined to think, is the true definition of a dependency;—that is, a territory distinct from the country in which the supreme sovereign power resides, but belonging rightfully to it, and subject to the laws and regulations which the sovereign may think proper to prescribe. It is not a colony, because it is not settled by the citizens of the sovereign, or mother state; but it is lawfully acquired or held, and the people are as much subjects of the state which has thus obtained it, as if they had been born in the principal state, and had emigrated to the dependent territory. The usual

ways by which such acquisitions are made, are by purchase, or by conquest in war. The first, being made with the consent of the sovereign, is permanent and indefeasible; but the latter is subject to uncertainty, and liable to restoration to the sovereign, from whom it was taken, unless confirmed by a treaty of peace, or unless it be voluntarily relinquished by such sovereign. When so confirmed, or relinquished, and not before, it seems to be, in the true sense of the word, a dependency; that is, it is durably incorporated into the dominions of the conqueror, and becomes a part of his territory, as to government and national right. Conquests in war, are, by the best authorities amongst elementary writers on national law, and according to the modern practice of nations, considered only as temporary possessions, held by force, and subject to be defeated by re-capture, or by the peace. Barbeyrac, in a note on part of the 8th chapter of Grotius, expresses the general idea on this subject. "But the object of a just war, does not require of itself, that one should acquire over the vanquished, an absolute and perpetual sovereignty. It is only a favourable opportunity of gaining dominion; and it requires always, beyond this, a consent either express, or tacit, of the conquered; otherwise a state of war always continues. The sovereignty of the conqueror, is nothing more than a title by force, and endures no longer than the conquered people are in a state of incapacity to throw off the yoke." "It is true," he adds, "that neutral powers are not to call in question this conquest, or say that it is unlawful, or the war unjust." But this does not alter the nature of the case, or give to the possession perpetual right and duration. It remains a conquest, liable to all the vicissitudes of war, and not a dependency—durably, legally, and indisputably attached. The dominion is only temporary, and it cannot be considered as a national territory and domain, being held on condition, and not in perpetual right. Vattel is full upon this subject. "Immovable lands, towns, provinces," &c. he says, "pass under the power of the enemy, who makes himself master of them; but it is only by the treaty of peace, or the entire submission and extinction of the state to which these towns and provinces belong, that the acquisition is completed, and the property becomes stable and perfect." Vatt. Law Nat. bk. 3, c. 13, § 197. So, also, section 198. See, also, Puff. Law Nat. bk. 8, c. 6, § 20.

It is not within the province of this court, to settle disputed rights between nations. But it is under the necessity of expounding laws, and of discovering, for our guidance, the meaning of the terms in which they are expressed. The court has not had an opportunity to enter into a minute investigation of the actual or political state of the island of Malta. But, on a general view of the books which detail its history, from the time it was

invaded by the French, until the period when this shipment was made, it does not seem to have been at any time permanently or rightfully incorporated with the domains of Great Britain. It continues a possession, gained by conquest from France, and not from the people or ancient government of the island; and consequently, the law of nations imposed an obligation upon the conquerer to restore the island to the people, and not to bring it under subjection to a new master. Vatt. Law Nat. bk. 3, c. 13, § 203. The island appears to be under a military government, notwithstanding the commander is styled "civil governor," or "commissioner;" and the officers of police, and a judge of the admiralty, are appointed by the military and civil governor. See Eton's Materials for a History of Malta, p. 89. The ancient laws of the island, executed by native magistrates, are yet in force—as is often the case in conquered countries, held in temporary subjection. No doubt, these magistrates are subject to the power and control of the occupant by conquest, for the time being. But the natives have never ceased to claim an independent right to the government and soil; although, from a detestation of their former oppressors and perfidious betrayers, the knights of St. John, they have frequently requested, and have as often been denied, the privileges and laws enjoyed by British subjects. See Pasley, pp. 306, 390, 391, 31, Memorial of the Maltese Deputies. Nothing shows more strongly that they are not considered by Great Britain herself as part of her subjects, or the island as part of her territories. By the treaty of Amiens, (after the offer of the Maltese to place themselves under the British government,) the British administration agreed to re-deliver the island to the knights, contrary to every stipulation, actual or implied, with the inhabitants. Quart. Rev. 1813, pp. 4, 5. This was a breach of confidence, palliated by her own writers only on the principle of expediency, and the advantages to be derived to England, either positively, or as a prevention to its falling into the hands of the French, to whom the knights were alleged to be devoted. Still, however, Great Britain bound herself, by this treaty, to abandon any claim she might have acquired to the island, and to restore it to its ancient government. After this, her title by conquest, imperfect and defeasible as it was, changed entirely its character. Before this agreement to restore the island, she had but a mere possession; but that possession was rightful—the continuance of it, after the treaty, was wrongful.

Under all these circumstances, the court is of opinion, that the island of Malta has been, and now is, held by Great Britain, by force, without right, in direct contravention of a solemn treaty. It is not the period, long or short, of such forcible possession, but the stability and right of the occupant, which, in the opinion of the court, will satisfy the true meaning of the term "dependency." It is only a foreign possession, without certain permanence or settled right. The decree of the district court affirmed.