**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SEA HUNT, INCORPORATED,
Plaintiff-Appellee,

and

COMMONWEALTH OF VIRGINIA,
Intervenor-Appellee,

v.

THE UNIDENTIFIED SHIPWRECKED
VESSEL OR VESSELS, THEIR APPAREL,
TACKLE, APPURTENANCES,AND CARGO
LOCATED WITHIN COORDINATES 38
DEGREES 01' 36" NORTH LATITUDE,
75 DEGREES 14' 33" WEST
LONGITUDE; 37 DEGREES 57' 21"
NORTH LATITUDE, 75 DEGREES
13' 00" WEST LONGITUDE; 38

DEGREES 01' 36" NORTH LATITUDE,
75 DEGREES 13' 14" WEST
LONGITUDE; 37 DEGREES 57' 33"
NORTH LATITUDE, 75 DEGREES
17' 44" WEST LONGITUDE AND/OR 37
DEGREES 55' 00" NORTH LATITUDE,
75 DEGREES 19' 18" WEST
LONGITUDE; 37 DEGREES 54' 09"
NORTH LATITUDE, 75 DEGREES
17' 00" WEST LONGITUDE; 37
DEGREES 51' 21" NORTH LATITUDE,
75 DEGREES 18' 52" WEST
LONGITUDE; 37 DEGREES 52' 20"
NORTH LATITUDE, 75 DEGREES
21' 05" WEST LONGITUDE, IN REM,
Defendant,

No. 99-2035

KINGDOM OF SPAIN,
Claimant-Appellant,

and

COMMONWEALTH OF VIRGINIA, ex rel
William A. Pruitt, Commissioner of
Marine Resources and Chairman of
the Virginia Marine Resources
Commission; ALPHA QUEST
CORPORATION; RICHARD L. COOK, an
individual resident of Ocean City,
Maryland,
Claimants,

and

UNITED STATES OF AMERICA;
COLUMBUS-AMERICA DISCOVERY
GROUP; SALVORS, INCORPORATED;
COBB COIN COMPANY, INCORPORATED;
INTERSAL, INCORPORATED; ENTERPRISE
MARINE, INCORPORATED; QUICKSILVER,
INCORPORATED; DEEP SEA RESEARCH,
INCORPORATED; STATE OF NORTH
CAROLINA,
Amici Curiae.

2

SEA HUNT, INCORPORATED,
Plaintiff-Appellant,

and

COMMONWEALTH OF VIRGINIA,
Intervenor-Plaintiff,

v.

THE UNIDENTIFIED SHIPWRECKED
VESSEL OR VESSELS, THEIR APPAREL,
TACKLE, APPURTENANCES,AND CARGO
LOCATED WITHIN COORDINATES 38
DEGREES 01' 36" NORTH LATITUDE,
75 DEGREES 14' 33" WEST
LONGITUDE; 37 DEGREES 57' 21"
NORTH LATITUDE, 75 DEGREES
13' 00" WEST LONGITUDE; 38

DEGREES 01' 36" NORTH LATITUDE,
75 DEGREES 13' 14" WEST
LONGITUDE; 37 DEGREES 57' 33"
NORTH LATITUDE, 75 DEGREES
17' 44" WEST LONGITUDE AND/OR 37
DEGREES 55' 00" NORTH LATITUDE,
75 DEGREES 19' 18" WEST
LONGITUDE; 37 DEGREES 54' 09"
NORTH LATITUDE, 75 DEGREES
17' 00" WEST LONGITUDE; 37
DEGREES 51' 21" NORTH LATITUDE,
75 DEGREES 18' 52" WEST
LONGITUDE; 37 DEGREES 52' 20"
NORTH LATITUDE, 75 DEGREES
21' 05" WEST LONGITUDE, IN REM,
Defendant,

No. 99-2036

3

KINGDOM OF SPAIN,
Claimant-Appellee,

and

COMMONWEALTH OF VIRGINIA, ex rel
William A. Pruitt, Commissioner of
Marine Resources and Chairman of
the Virginia Marine Resources
Commission; ALPHA QUEST
CORPORATION; RICHARD L. COOK, an
individual resident of Ocean City,
Maryland,
Claimants,

and

UNITED STATES OF AMERICA;
COLUMBUS-AMERICA DISCOVERY
GROUP; SALVORS, INCORPORATED;
COBB COIN COMPANY, INCORPORATED;
INTERSAL, INCORPORATED; ENTERPRISE
MARINE, INCORPORATED; QUICKSILVER,
INCORPORATED; DEEP SEA RESEARCH,
INCORPORATED; STATE OF NORTH
CAROLINA,
Amici Curiae.

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
J. Calvitt Clarke, Jr., Senior District Judge.
(CA-98-281-2)

Argued: May 1, 2000

Decided: July 21, 2000

Before WILKINSON, Chief Judge, and LUTTIG
and MICHAEL, Circuit Judges.

4

Affirmed in part and reversed in part by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Luttig and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** James Alexander Goold, COVINGTON & BURLING, Washington, D.C., for Appellant. Richard Alan Olderman, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae United States. William Henry Hurd, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; David Jeremy Bederman, Atlanta, Georgia, for Appellees. **ON BRIEF:** Robert A. Long, Jr., Kevin C. Newsom, William C. Muffett, COVINGTON & BURLING, Washington, D.C., for Appellant. David W. Ogden, Acting Assistant Attorney General, Helen F. Fahey, United States Attorney, Robert S. Greenspan, Barbara A. O'Malley, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae United States. Anthony Francis Troy, David K. Sutelan, MAYS & VALENTINE, Richmond, Virginia; Peter E. Hess, Wilmington, Delaware, for Appellee Sea Hunt. Richard T. Robol, Columbus, Ohio, for Amicus Curiae Columbus-America. Patrick M. Brogan, DAVEY & BROGAN, P.C., Norfolk, Virginia, for Amici Curiae Salvors, et al. Michael F. Easley, North Carolina Attorney General, Ronald M. Marquette, Special Deputy Attorney General, Charles J. Murray, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Amicus Curiae North Carolina.

_____

**OPINION**

WILKINSON, Chief Judge:

This in rem admiralty action concerns the sovereign rights of the Kingdom of Spain to two of its Royal Naval vessels, LA GALGA and JUNO, which were lost off the shores of present-day Virginia in 1750 and 1802 respectively. Pursuant to the Abandoned Shipwreck Act of

5

1987 (ASA), 43 U.S.C. § 2101-06 (1994), Virginia has asserted ownership over the shipwrecks and has issued Sea Hunt permits to conduct salvage operations and recover artifacts from the wrecks. These efforts resulted in the discovery of two wrecks believed to be LA GALGA and JUNO. Sea Hunt filed an in rem admiralty complaint, and the district court ordered an arrest of the shipwrecks, appointing Sea Hunt the exclusive salvor. Spain filed a verified claim asserting ownership over the shipwrecks. The district court found that Spain retained title to JUNO, but had expressly abandoned LA GALGA in the 1763 Definitive Treaty of Peace. See Sea Hunt, Inc. v. Unidentified, Shipwrecked Vessel or Vessels, 47 F. Supp. 2d 678 (E.D. Va. 1999). The district court also denied Sea Hunt a salvage award.

As sovereign vessels of Spain, LA GALGA and JUNO are covered by the 1902 Treaty of Friendship and General Relations between the United States and Spain. The reciprocal immunities established by this treaty are essential to protecting United States shipwrecks and military gravesites. Under the terms of this treaty, Spanish vessels, like those belonging to the United States, may only be abandoned by express acts. Sea Hunt cannot show by clear and convincing evidence that the Kingdom of Spain has expressly abandoned these ships in either the 1763 Treaty or the 1819 Treaty of Amity, Settlement and Limits, which ended the War of 1812. We therefore reverse the judgment of the district court with regard to LA GALGA, and affirm the judgment of the district court concerning JUNO and the denial of a salvage award.

I.

LA GALGA ("The Greyhound") was a fifty-gun frigate commissioned into the Spanish Navy in 1732. LA GALGA left Havana on its last voyage on August 18, 1750, in order to escort a convoy of merchant ships to Spain. It carried the Second Company of the Sixth Battalion of Spanish Marines, Spanish Royal property, and English military prisoners. On August 25, 1750, the convoy encountered a hurricane near Bermuda that scattered the ships and forced them westward toward the American coast. LA GALGA eventually sank off the coast of the Maryland/Virginia border. Most of the crew and passengers reached land safely. When Captain Daniel Houny attempted to salvage items from the wreck, he found that local residents had

6

already begun looting the vessel. He secured the assistance of Governor Ogle of Maryland, but any further salvage efforts ended when a second storm came and broke up what was left of the ship. LA GALGA remained undisturbed until the recent salvage efforts by Sea Hunt.

The JUNO, a thirty-four gun frigate, entered the service of the Spanish Navy in 1790. On January 15, 1802, JUNO set sail from Veracruz bound for Spain. On board JUNO were the soldiers of the Third Battalion of the Regiment of Africa, their families, and various civilian officials. The JUNO was beset by a ferocious storm and began taking on water. It encountered the American schooner LA FAVORITA. The two ships sailed together trying to reach an American port before JUNO succumbed to her leaks. As JUNO continued to take on water, the Captain ordered his passengers and crew to begin transferring to LA FAVORITA. But only seven persons were able to transfer before the storm picked up and JUNO was lost in a heavy fog. LA FAVORITA could come close enough only to hear the anguished cries for help as JUNO went under. At least 413 sailors, soldiers, and civilians perished in the sinking of JUNO. Spanish authorities ordered an investigation into the sinking, but the location of the wreck was not discovered until Sea Hunt's recent efforts.

The Commonwealth of Virginia has asserted ownership over LA GALGA and JUNO pursuant to the Abandoned Shipwreck Act of 1987 (ASA), 43 U.S.C. §§ 2101-06 (1994). The ASA gives states title to shipwrecks that are abandoned and are embedded in the submerged lands of a state. See id. § 2105(a) & (c). Sea Hunt is a maritime salvage company based in the Eastern Shore of Virginia. The Virginia Marine Resources Commission granted Sea Hunt permits to explore for shipwrecks off the Virginia coast and conduct salvage operations. Sea Hunt began to explore for shipwrecks within its permit areas and has spent about a million dollars in conducting remote sensing, survey, diving, and identification operations. Sea Hunt claims that its efforts have resulted in finding the remains of LA GALGA and JUNO.

To avoid interference with its operations, Sea Hunt initiated an in rem admiralty action against the two wrecks on March 11, 1998. Sea Hunt sought a declaratory judgment that the shipwrecked vessels

7

"have never been subject to the sovereign prerogative of the Kingdom of Spain and [are] subject to admiralty's laws of abandonment and the law of finds," that "the Commonwealth of Virginia be adjudged the true, sole and exclusive owner of the Shipwrecked Vessel(s)," and that any items salvaged therefrom by Sea Hunt be distributed pursuant to the permits issued by Virginia. In the alternative, Sea Hunt sought a liberal salvage award for its efforts. On March 12, 1998, the district court issued an order directing the arrest of the shipwrecked vessels and granting Sea Hunt exclusive rights of salvage until further notice. The court also directed Sea Hunt to send specific notice of the action to both the United States and to Spain.

In response, the United States moved to intervene and filed a verified claim on behalf of Spain. The district court found that the United States lacked authority to appear on behalf of Spain and granted Spain 90 days to refile a verified claim. See Sea Hunt, Inc. v. Unidentified, Shipwrecked Vessel or Vessels, 22 F. Supp. 2d 521, 526 (E.D. Va. 1998). Spain's verified claim stated that the Kingdom of Spain "was and still is the true and bona fide owner of the vessels JUNO and LA GALGA . . . and that title and ownership interest in said vessels has never been abandoned or relinquished or transferred by the Kingdom of Spain." Spain put forth affidavits and exhibits showing that at the time of their sinking both ships were serving as vessels of the Royal Navy, that both vessels are currently on the register of the Spanish Navy, and that transfer or abandonment of the vessels would require formal authorization by the government of Spain.

On April 27, 1999, the district court found that the express abandonment standard applied to these shipwrecks and that Spain had abandoned its claim to LA GALGA under Article XX of the 1763 Definitive Treaty of Peace between France, Great Britain and Spain. See Sea Hunt, Inc. v. Unidentified, Shipwrecked Vessel or Vessels, 47 F. Supp. 2d 678, 690 (E.D. Va. 1999). It further found that Spain did not expressly abandon JUNO in the 1819 Treaty ending the conflict between Spain and the United States stemming from the War of 1812. See id. In a later decision the district court held that Sea Hunt could not rightfully claim a salvage award because Spain, as the acknowledged owner of JUNO, had expressly refused salvage services. The Kingdom of Spain now appeals the judgment concerning LA

8

GALGA. The Commonwealth and Sea Hunt note a cross-appeal with regard to JUNO and the denial of a salvage award.

## II.

In order for Virginia to acquire title to the shipwrecks and to issue salvage permits to Sea Hunt, these vessels must have been abandoned by Spain. Sea Hunt and the Commonwealth argue that the Abandoned Shipwreck Act requires application of an implied abandonment standard for shipwrecks in coastal waters, and that Spain has abandoned LA GALGA and JUNO. Because Spain has asserted an ownership claim to the shipwrecks, however, express abandonment is the governing standard. See Columbus-America Discovery Group v. Atlantic Mutual Ins. Co., 974 F.2d 450, 464-65 (4th Cir. 1992). To adopt a lesser standard would not only go beyond what the ASA requires. It would also abrogate America's obligations to Spain under the 1902 Treaty of Friendship and General Relations.

## A.

Under the ASA, the United States asserts title to any abandoned shipwreck that is on or embedded in the submerged lands of a State. See 43 U.S.C. § 2105(a). Title is then automatically transferred to the State in whose submerged lands the shipwreck is located. See id. § 2105(c). "Submerged lands" for the purposes of the ASA includes coastal waters three miles from shore. Id.§ 2102(f)(1), § 1301(a)(2). For a state to acquire title to a shipwreck it must be (1) abandoned and (2) on or embedded in the submerged lands of a state. Id. § 2105(a) & (c). It is undisputed that LA GALGA and JUNO are within Virginia's submerged lands. That, however, is not enough. We must address whether these frigates were abandoned by Spain. If the shipwrecks were abandoned, then Sea Hunt would have control over them in accordance with its state-issued permits.

The ASA does not define the critical term "abandoned." Nothing in the Act indicates, however, that implied abandonment should be the standard in a case such as this where a sovereign asserts ownership to its vessels. The Act states in its findings that "abandoned shipwrecks" are those "to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101(b). The statute thus pro-

9

vides that a shipwreck is abandoned only where the owner has relinquished ownership rights. When an owner comes before the court to assert his rights, relinquishment would be hard, if not impossible, to show. Requiring express abandonment where an owner makes a claim thus accords with the statutory text. Further, although the legislative history states that abandonment may be implied, it may be implied "as by an owner never asserting any control over or otherwise indicating his claim of possession." H.R. Rep. No. 100-514(I), at 2 (1988), reprinted in 1988 U.S.C.C.A.N. 365, 366. An owner who comes forward has definitely indicated his claim of possession, and in such a case abandonment cannot be implied.

The legislative history of the ASA suggests that sovereign vessels must be treated differently from privately owned ones. The House Report incorporates a State Department letter, which states, "the U.S. only abandons its sovereignty over, and title to, sunken U.S. warships by affirmative act; mere passage of time or lack of positive assertions of right are insufficient to establish such abandonment." H.R. Rep. No. 100-514(II), at 13 (1988), reprinted in 1988 U.S.C.C.A.N. at 381. The implications of this for other sovereign vessels is also underscored: "[T]he same presumption against abandonment will be accorded vessels within the U.S. territorial sea that, at the time of their sinking, were on the non-commercial service of another State." Id. Under the ASA, then, an implied abandonment standard would seem least defensible where, as here, a nation has stepped forward to assert ownership over its sovereign shipwrecks.

B.

Further, courts have held that the ASA "did not affect the meaning of `abandoned,' which serves as a precondition for the invocation of the ASA's provisions." Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel, 177 F.3d 491, 499 (6th Cir. 1999). According to the Supreme Court, "the meaning of `abandoned' under the ASA conforms with its meaning under admiralty law." California v. Deep Sea Research, Inc., 523 U.S. 491, 508 (1998). The Supreme Court never suggested that by conferring title to the states the ASA somehow altered the traditional admiralty definition of abandonment. While the common law of admiralty must be developed consonant with federal

10

statutes, see American Dredging Co. v. Miller , 510 U.S. 443, 455 (1994), here the ASA has not altered the admiralty law background.

Under admiralty law, where an owner comes forward to assert ownership in a shipwreck, abandonment must be shown by express acts. See Columbus-America Discovery Group v. Atlantic Mutual Ins. Co., 974 F.2d 450 (4th Cir. 1992). "[S]hould an owner appear in court and there be no evidence of an express abandonment," title to the shipwreck remains with the owner. Id. at 461. This principle reflects the long standing admiralty rule that when "articles are lost at sea the title of the owner in them remains." The AKABA, 54 F. 197, 200 (4th Cir. 1893). When "a previous owner claims long lost property that was involuntarily taken from his control, the law is hesitant to find an abandonment." Columbus-America, 974 F.2d at 467-68; see also Fairport, 177 F.3d at 498; Hener v. United States, 525 F. Supp. 350, 356-57 (S.D.N.Y. 1981). An inference of abandonment is permitted, but only when no owner appears. See Columbus-America, 974 F.2d at 464-65 ("Should the property encompass an ancient and longlost shipwreck, a court may infer an abandonment. Such an inference would be improper, though, should a previous owner appear and assert his ownership interest . . . .").

Appellees point us to no case applying an implied abandonment standard where a sovereign owner has come forward to assert a claim to its property. Although Sea Hunt and the Commonwealth character- ize the rule of Columbus-America as an anomaly, it reflects well- established admiralty law doctrine and existing case law. For instance, in Fairport the Sixth Circuit adopted a test of "inferential abandonment." It emphasized, however, that there is a "uniform con- cern that courts impose a high burden on those who argue that an owner abandoned property that sank against his will." 177 F.3d at 499; see also id. at 500 ("Proof by inference still requires proof, not conjecture -- a requirement bolstered by the exacting burden of proof admiralty law imposes on those who allege abandonment."). The Sixth Circuit also expressly limited its holding to "vessels formerly owned by private parties, and express[ed] no view as to the applica- tion of the express abandonment test to vessels initially owned by the United States." Id. at 500.

The First and Fifth Circuits have also never suggested that an implied abandonment standard would govern in a case involving a

11

claim by an original owner to its property. See <u>Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel</u>, 833 F.2d 1059, 1065 (1st Cir. 1987) (emphasizing that "no person or firm appeared to assert any overall claim of ownership"); <u>Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel</u>, 640 F.2d 560, 567 (5th Cir. 1981) (noting that "salvage of a vessel or goods at sea, even when the goods have been abandoned, does not divest the original owner of title or grant ownership rights to the salvor, except in extraordinary cases"). Appellees' attempts to glean a broad implied abandonment standard from circuit law overlooks one salient point -- none of the cases they rely upon involved an original sovereign owner's claim to its shipwrecked vessels. To adopt an implied abandonment standard in this context would casually divest sovereigns of ships which sank against their will and to which they still lay claim.

C.

Finally, the express abandonment standard is required by Article X of the 1902 Treaty of Friendship and General Relations between the United States and Spain. Article X provides, "In cases of shipwreck, damages at sea, or forced putting in, each party shall afford to the vessels of the other . . . the same immunities which would have been granted to its own vessels in similar cases." Treaty of Friendship and General Relations, July 3, 1902, U.S.-Spain, 33 Stat. 2105. According to the United States Department of State, "this provision is unique" in that no other "friendship, commerce and navigation (FCN) treaty of the United States contains such a broadly worded provision applying to State ships entitled to sovereign immunity." Statement of Interest, U.S. Dep't of State, ¶ 13 (Dec. 18, 1998). This treaty requires that imperiled Spanish vessels shall receive the same immunities conferred upon similarly situated vessels of the United States.

United States vessels may only be abandoned by an express, unambiguous, and affirmative act. Article IV of the Constitution states, "Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3. From this it follows that the Constitution precludes a finding of implied abandonment of federal lands and property -- dispositions of federal property require

12

some congressional action. "[T]he United States cannot abandon its own property except by explicit acts." See United States v. Steinmetz, 973 F.2d 212, 222 (3d Cir. 1992). The Supreme Court has emphasized that the United States cannot be precluded from asserting its ownership rights by private property "principles similar to laches, estoppel or adverse possession." United States v. California, 332 U.S. 19, 39-40 (1947). The government "holds its interests here as elsewhere in trust for all the people," and thus cannot relinquish its property without express acts. Id. at 40. The House Report for the ASA also relates the understanding that "U.S. warships and other public vessels . . . require an affirmative act of abandonment." H.R. Rep. No. 100-514(II), at 5 (1988), reprinted in 1988 U.S.C.C.A.N. at 374. Thus, one of the immunities granted to United States vessels is that they will not be considered abandoned without a clear and affirmative act by the government.

Under the terms of the 1902 Treaty, Spanish vessels can likewise be abandoned only by express renunciation. Both Spain and the United States agree that this treaty provision requires that in our territorial waters Spanish ships are to be accorded the same immunity as United States ships. They also agree that such immunity requires application of the express abandonment standard."When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 185 (1982). We cannot therefore adopt an implied abandonment standard in the face of treaties and mutual understandings requiring express abandonment. Such a standard would supplant the textual framework of negotiated treaties with an unpredictable judicial exercise in weighing equities.

Applying the express abandonment standard to sovereign vessels also respects the legitimate interests of the executive branch. While the ASA confers title to abandoned shipwrecks to the states, it does not vitiate important national interests or undermine the well-established prerogatives of sovereign nations. Department of Interior advisory guidelines on the ASA state that a sovereign vessel that appears to have been abandoned "remains the property of the nation to which it belonged at the time of sinking unless that nation has

13

taken formal action to abandon it or to transfer title to another party." 55 Fed. Reg. 50116, 50121 (1990). The State Department has likewise emphasized that its policy is "to recognize claims by foreign governments -- such as in this case by the Government of Spain regarding the warships JUNO and LA GALGA -- to ownership of foreign warships sunk in waters of the United States without being captured, and to recognize that title to such sunken warships is not lost absent express abandonment by the sovereign ." Statement of Interest, U.S. Dep't of State, ¶ 9 (emphasis added). Further, the State Department notes, "U.S. domestic law is consistent with the customary international law rule that title to sunken warships may be abandoned only by an express act of abandonment." Id. ¶ 15.

In a case such as this, it is "not for the courts to deny an immunity which our government has seen fit to allow." Republic of Mexico v. Hoffman, 324 U.S. 30, 35 (1945) (involving an in rem admiralty action against foreign owned merchant vessel). Our Constitution charges the political branches with the conduct of foreign affairs. See Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 109-10 (1948). The express abandonment standard is regularly applied by the executive branch in dealing with foreign vessels. It is simply not for us to impose a looser standard that would interfere with this long standing political judgment in sensitive matters of international law.

III.

We now address whether there has been an express abandonment of LA GALGA.[1] The district court found that Spain had expressly abandoned LA GALGA in Article XX of the Treaty of 1763. See Sea Hunt, 47 F. Supp. 2d at 690. This interpretation, however, contra-

_____

[1] We affirm the district court's holding that JUNO was not expressly abandoned in the 1819 Treaty. Article II of that treaty transferred territory from Spain to the United States. But, as the district court noted, "Nothing in Article 2 implies that Spain has ceded anything other than territory and the structures erected on that territory." Sea Hunt, 47 F. Supp. 2d at 690. We agree that Spain did not expressly abandon JUNO in the 1819 Treaty for the reasons stated by the district court. See id. at 690-91.

14

venes the plain language of the 1763 Treaty. It also flies in the face of the understandings of Spain and Great Britain, the relevant parties to Article XX. It impairs as well the respect that international law accords Spain's claim of ownership with regard to its shipwrecks and the military grave sites that they contain.

A.

Sea Hunt and Virginia must demonstrate express abandonment by "clear and convincing evidence." Columbus-America, 974 F.2d at 464; see also Fairport, 177 F.3d at 501; accord Falgout Bros., Inc. v. S/V Pangaea, 966 F. Supp. 1143, 1145 (S.D. Ala. 1997); Hener, 525 F. Supp. at 357. This is a high burden and an"exacting standard." Fairport, 177 F.3d at 501. The district court found such clear and convincing evidence of an express abandonment in the 1763 Definitive Treaty of Peace between France, Great Britain, and Spain, which ended the Seven Years War and transferred most of Spain's territories in the new world to Great Britain. See Sea Hunt , 47 F. Supp. 2d at 689 ("The sweeping language of Spain's cession in Article XX, together with the background of the complete change of sovereignty in the North American colonies, makes it unlikely that Spain intended to, or would have been allowed by Great Britain to maintain a claim of ownership over the wreck of LA GALGA . . . .").

We disagree with the district court's interpretation. Article XX of the 1763 Treaty provides:

> [H]is Catholick Majesty cedes and guaranties, in full right, to his Brittanic Majesty, Florida, with Fort St. Augustin, and the Bay of Pensacola, as well as all that Spain possesses on the continent of North America, to the East or to the South East of the river Mississippi. And, in general, every thing that depends on said countries and lands, with the sovereignty, property, possession, and all rights, acquired by treaties or otherwise. . . . [S]o that the Catholick King cedes and makes over the whole to the said King and to the Crown of Great Britain, and that in the most ample manner and form. . . . It is moreover stipulated, that his Catholick Majesty shall have power to cause all the effects that may belong to

15

> him, to be brought away, whether it be artillery or other
> things.

Definitive Treaty of Peace, Feb. 10, 1763, Fr.-Gr. Brit.-Spain, art. 20, Consol. T.S. 331-32.

The plain language of this treaty provision contains no evidence of an express abandonment. First, Article XX does not include any of the common nouns that could refer to LA GALGA. Notably absent are the terms "shipwreck," "vessels,""frigates," or "warships." Other provisions of the treaty mention these terms explicitly. For instance, Article III, which provides for the restoration of prisoners, states "all the ships of war and merchant vessels which shall have been taken . . . shall likewise be restored." See also Art. VIII (stating that the British may remove their belongings in "vessels"); Art. XIX (same). Further, the treaty also specifically catalogues items other than territory intended to be conveyed. For instance the treaty transfers control of "factories," Art. XI, "artillery," Art. XII, "fortresses," Art. XIX, "castles," Art. XXI, and "papers, letters, documents, and archives," Art. XXII. When the parties to the 1763 Treaty intended to cede non-territorial state property, they did so with great particularity. Yet nowhere does the treaty specifically mention the cession of "shipwrecks." "Express" is defined as "firmly and explicitly stated; particular, specific." Webster's II New College Dictionary 396 (1999). Without any mention of shipwrecks or any seagoing vessels it is hard to read Article XX as an express abandonment of LA GALGA.

Second, the cession of state property in Article XX is limited to all that Spain possesses "on the continent of North America." The plain meaning of this is that Spain ceded to Great Britain only what was located on land. Spain did not cede possessions in the sea or seabed. The district court focused on the fact that the"clause is a sweeping grant of territory and property," yet overlooked the "on the continent" limitation. This limitation excludes wrecks like LA GALGA that were located not on the continent, but in the seabed.

Sea Hunt and the Commonwealth urge that "on the continent" included coastal waters, and that consequently the 1763 Treaty constitutes an express abandonment of LA GALGA. Yet in a similar provision of the treaty, the parties specifically cede both land and the

16

coasts. Article IV cedes French Canada to Great Britain and specifi-
cally provides for cession of "in general every thing that depends on
the said countries, lands, islands, and coasts " (emphasis added). It
also transfers all rights held "over the said countries, lands, islands,
places, coasts, and their inhabitants" (emphasis added). By contrast,
Article XX states that Spain cedes to Great Britain"in general, every
thing that depends on the said countries and lands," and all rights
"over the said countries, lands, places, and their inhabitants." There
is no mention at all of coasts in Article XX.

Moreover, in light of eighteenth century understandings, this "on
the continent" language would hardly amount to clear and convincing
evidence of an express abandonment of property in coastal waters. In
fact, the three-mile coastal belt, well-recognized today, had no clear
counterpart in eighteenth century international law. Ownership of the
three-mile belt in the eighteenth century was but a"nebulous sugges-
tion." United States v. California, 332 U.S. at 32. When "in 1776 the
American colonies achieved independence and when in 1783 the
Treaty of Paris was concluded, neither the British crown nor the colo-
nies individually had any right of ownership of the seabed of the sea
adjacent to the American coast." Report of Special Master Maris,
O.T. 1973, No. 35 Orig. at 47, adopted by United States v. Maine, 420
U.S. 515 (1975). Sovereign rights to the territorial sea were not estab-
lished in international law until some time in the nineteenth century.
See California, 322 U.S. at 33; accord Maine , 420 U.S. at 524. Nine-
teenth century and present-day views of territorial cession are hardly
dispositive of what mid-eighteenth century treaty signatories
intended. See Shively v. Bowlby, 152 U.S. 1, 57 (1894); United States
v. Ancgog, 190 F. Supp. 696, 698 (D. Guam 1961).

Third, Article XX provides that Spain ceded "every thing that
depends on the said countries and lands." The district court found that
this included the wreck of LA GALGA. See Sea Hunt, 47 F. Supp.
2d at 689. It is anything but clear, however, given eighteenth century
understandings, that "every thing that depends" can be interpreted to
include this shipwreck. When interpreting this same clause of Article
XX, Chief Justice Marshall noted, "By the 20th article of the [1763]
treaty, Spain ceded Florida, with its dependencies, and all the country
she claimed east or south-east of the Mississippi, to Great Britain."
Johnson and Graham's Lessee v. McIntosh, 21 U.S. (8 Wheat.) 543,

17

584 (1823) (emphasis added). At the time, "dependencies" meant other territories that were dependent upon the sovereign country. A dependency was "a territory distinct from the country in which the supreme sovereign power resides, but belonging rightfully to it, and subject to the laws and regulations which the sovereign may think proper to prescribe." United States v. THE NANCY, 27 F. Cas. 69, 71 (C.C.D. Pa. 1814) (No. 15,854); see also Webster's II 303 (defining "dependency" as a "territory or state under the jurisdiction of another country from which it is separated geographically"). Under the Supreme Court's relatively contemporaneous interpretation, "every thing that depends" does not include Spanish property such as the shipwrecks, but rather refers to "dependencies" such as nearby islands.

Fourth, Article XX provides that "his Catholick Majesty shall have power to cause all the effects that may belong to him, to be brought away, whether it be artillery or other things." There is no deadline for the right to take this property away. Rather the right is guaranteed irrespective of the time elapsed. By contrast, other provisions of the Treaty specifically set time limits for certain actions. For instance, Article XX itself states that Spanish subjects may "bring away their effects, as well as their persons . . . the term limited for this emigration being fixed to the space of eighteen months." See also Art. VIII (providing four months for the demolition of fortresses); Art. XIII (eighteen months for the emigration of British subjects from Guadaloupe); Art. XXIV (providing different time periods for various "restitutions" and "evacuations"). His "Catholick Majesty," however, has no limitation whatsoever on the removal of state property. In treaty interpretation as in statutory interpretation, particular provisions may not be divorced from the document as a whole. See Kolovrat v. Oregon, 366 U.S. 187, 195-96 (1961) (refusing to interpret a treaty provision in isolation). Where such specific time limits were included for a variety of different actions but not included for the clause at issue here, there is a strong presumption that no time limit applies.

In sum, Article XX does not contain "clear and convincing" evidence of express abandonment. While the language of Article XX encompasses a great deal of land and property, it does not mention vessels or shipwrecks, nor does Article XX refer to Spanish property in the sea or on the seabed. Such general treaty language does not

18

come close to an "express declaration abandoning title," Columbus-America, 974 F.2d at 464, and therefore cannot amount to clear and convincing evidence of an express abandonment.

B.

This view of the treaty is not ours alone. Both parties to Article XX of the 1763 Treaty agree that the Kingdom of Spain did not abandon LA GALGA. Such agreement is significant. When "the parties to a treaty both agree as to the meaning of a treaty provision . . . we must, absent extraordinarily strong contrary evidence, defer to that interpretation." Sumitomo Shoji, 457 U.S. at 185; see also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 167 (1999) (the terms of a treaty must be given a "meaning consistent with the shared expectations of the contracting parties" (internal quotation marks omitted)). "Treaties are contracts between sovereigns, and as such, should be construed to give effect to the intent of the signatories." Tabion v. Mufti, 73 F.3d 535, 537 (4th Cir. 1996). Postratification understandings of the contracting parties are traditionally considered as aids to treaty interpretation. See El Al Israel Airlines, 525 U.S. at 167.

After the district court issued its judgment, the United Kingdom issued a formal Diplomatic Note clarifying that Article XX of the 1763 Treaty "cannot be interpreted as involving an express abandonment by Spain of its rights to the shipwreck of`LA GALGA.' . . . [T]he intention behind Article XX was to transfer sovereignty over the territories mentioned in that Article, and not to deal with, or otherwise affect, the quite separate issue of the ownership of shipwrecks on the waters adjacent to these or other territories in North America." Spain also issued a Diplomatic Note reaffirming its view that the 1763 Treaty "was not a cession or abandonment of H.M. Frigate `LA GALGA' or other shipwrecked vessels of Spain.""While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight." Kolovrat , 366 U.S. at 194. We decline to disregard the position of the relevant treaty signatories that Article XX was not intended to include movable property located in coastal waters. Given that their view accords with the language and structure of the Treaty itself, it can hardly be contended that Sea Hunt

19

has put forward "extraordinarily strong contrary evidence," to rebut the parties' interpretation.

## C.

Although we believe the standard of express abandonment controls in the circumstances of this case, it would be difficult under any test to conclude that LA GALGA was abandoned. The mere passage of time since a shipwreck is not enough to constitute abandonment. See Columbus-America, 974 F.2d at 461; Fairport , 177 F.3d at 499 (length of time "one factor among several relevant to whether a court may infer abandonment"). Spain attempted salvage after LA GALGA sank, maintained LA GALGA on its naval registry, and asserted a claim after Sea Hunt brought its admiralty action. Moreover, the ship-wreck lies scattered and buried in the sand beneath the water, and technology has only recently become available for its salvage. See Yukon Recovery, L.L.C. v. Certain Abandoned Property , 205 F.3d 1189, 1194 (9th Cir. 2000) ("[L]ack of technology is one factor to consider in determining whether inaction constitutes abandonment."). In other cases where abandonment was found for Spanish wrecks, Spain made no claim of ownership. See Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel , 569 F.2d 330, 337 (5th Cir. 1978) (noting that "[t]he modern day government of Spain has expressed no interest in filing a claim in this litigation as a successor owner"); Lathrop v. Unidentified, Wrecked & Abandoned Vessel, 817 F. Supp. 953, 956 (M.D. Fla. 1993) (finding that "no one . . . asserted an interest in the alleged vessel"). By contrast, Spain has vigorously asserted its interest in the wreck of LA GALGA and wishes to maintain it as a sacred military gravesite. In light of these circumstances, even a finding of implied abandonment would be improper.

## D.

The United States has strenuously defended Spain's ownership over these vessels. The government maintains that this is required by our obligations under the 1902 Treaty as well as general principles of international comity. The United States "is the owner of military ves-sels, thousands of which have been lost at sea, along with their crews. In supporting Spain, the United States seeks to insure that its sunken

20

vessels and lost crews are treated as sovereign ships and honored graves, and are not subject to exploration, or exploitation, by private parties seeking treasures of the sea." Amicus Curiae Br. of U.S. at 1. Protection of the sacred sites of other nations thus assists in preventing the disturbance and exploitation of our own. Here the government's interest is rooted in customary international law. See 8 Digest of U.S. Practice in International Law 999, 1006 (1980) (noting that interference with sunken military vessels, "especially those with deceased individuals," is "improper" and that foreign governments' requests to have such views respected "should be honored").

It bears repeating that matters as sensitive as these implicate important interests of the executive branch. Courts cannot just turn over the sovereign shipwrecks of other nations to commercial salvors where negotiated treaties show no sign of an abandonment, and where the nations involved all agree that title to the shipwrecks remains with the original owner. Far from abandoning these shipwrecks, Spain has vigorously asserted its ownership rights in this proceeding. Nothing in the law of admiralty suggests that Spain has abandoned its dead by respecting their final resting place at sea.

IV.

We reverse the judgment of the district court that the Kingdom of Spain abandoned the vessel LA GALGA. We affirm the judgment of the district court as to JUNO. Both vessels remain the property of Spain.[2] The judgment of the district court is accordingly

AFFIRMED IN PART AND REVERSED IN PART.

_____

[2] We affirm the district court's denial of a salvage award to Sea Hunt. The district court found, "It is the right of the owner of any vessel to refuse unwanted salvage. Sea Hunt knew before bringing this action that the JUNO was a Spanish ship and that Spain might make a claim of ownership and decline salvage. . . . Because Sea Hunt had prior knowledge of Spain's ownership interests and had reason to expect Spain's ownership claim and refusal to agree to salvage activity on JUNO, Sea Hunt can not be entitled to any salvage award."

21